**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SCOTT HOLLAND,** on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**CHRISTIAN DIOR, INC. AND CHRISTIAN DIOR COUTURE SAS,**<br><br>*Defendants*. | Case No.<br><br>**COMPLAINT – Class Action**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Scott Holland ("Plaintiff" or "Holland"), on behalf of himself and on behalf of all others similarly situated, alleges the following against Defendants, Christian Dior, Inc. and Christian Dior Couture SAS ("Defendants"), upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendants (the "Data Breach"), which held in their possession certain personally identifiable information ("PII") of Plaintiff and other current and former customers of Defendants.

2. Defendants owe these individuals an affirmative duty to adequately protect and safeguard this private information against theft and misuse. Despite such duties created by

statute, regulation, and common law, at all relevant times, Defendants utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

3. Defendants experienced a significant data breach on January 26, 2025, which Defendants did not discover until May 7, 2025.[1]

4. Defendants learned that an unauthorized actor gained access to a Dior database that contained information about Dior customers.[2]

5. Defendants did not begin to notify affected consumers until on or around July 18, 2025.[3]

6. But for Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect the PII in their possession, the Data Breach would not have occurred.

7. Defendants are well-aware that they are at high risk of attempted cyberattack due to the high value of the sensitive data.

8. Despite Defendants' awareness of both the value and sensitivity of the data they safeguarded and serious risk presented by insufficient security practices, Defendants did not take sufficient steps to ensure that their systems were secure. Defendants knew or should have known about the risk to the data they stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

9. The Data Breach was directly and proximately caused by Defendants' failure to implement reasonable and industry-standard data security practices necessary to protect their systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the

---

[1] *See* Exhibit A.
[2] *Id.*
[3] *Id.*

sensitive PII of an undisclosed number of individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members (defined below) are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

10. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

11. Moreover, Defendants' failure to notify Plaintiff and Class Members that they had been impacted by this data breach for over two months after Defendants became aware of the breach, and almost six months after the breach occurred harmed Plaintiff and made it more difficult for Plaintiff to take swift action to respond to the breach.

12. Plaintiff and Class Members have been harmed because they are at immediate risk of having their personal information used against them. Indeed, they have been at risk well before Defendants even notified Plaintiff of the breach. Plaintiff does not know if his data has

been sold, transferred, replicated, or irrevocably disseminated and exposed. Plaintiff suffered harm in the loss of the value of his data which cannot be easily recovered, if ever.

13. Plaintiff, individually and on behalf of a nationwide class, alleges claims of (1) Negligence, (2) Negligence *Per Se*, (3) Breach of Implied Contract; and (4) Unjust Enrichment. Plaintiff also seeks declaratory and injunctive relief. Plaintiff asks the Court to compel Defendants to adopt reasonable information security practices to secure the sensitive PII that Defendants collect and store in their databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

14. Holland is and at all times mentioned herein a resident and citizen of Glen Allen, Virginia.

***Defendants***

15. Defendant Christian Dior, Inc. is a for-profit corporation organized under the laws of the State of New York with its principal place of business in New York, New York.

16. Defendant Christian Dior Couture SAS is a foreign corporation with its principal place of business in France.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over Defendants through Defendant Christian Dior, Inc.'s business operations in this District, including the conduct giving rise to this Action. Defendant Christian Dior, Inc.'s principal place of business is in this District. Defendant Christian Dior, Inc. intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to this action occurred in this District. Defendant Christian Dior, Inc. is also based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members from or within this District.

## FACTUAL ALLEGATIONS

### I. Background

20. Founded in 1946 by French designer Christian Dior, Defendant Christian Dior SAS "is a French multinational luxury goods company."[4]

21. Defendants' holding company Christian Dior SE recorded a revenue of 84.7 billion Euros in 2024.[5]

22. As a condition of purchasing luxury goods from Defendants, Plaintiff and Class Members were required to provide Private Information to Defendant. According to Defendants' Privacy Statement, "if you make purchases from dior.com or in our stores, we must collect information to process (and, if relevant, fulfill and ship) your order."[6]

---

[4] *Dior*, WIKIPEDIA, https://en.wikipedia.org/wiki/Dior (last accessed July 28, 2025).
[5] Christian Dior SE, *Christian Dior : Christian Dior achieves a solid performance despite an unfavorable global economic environment*, YAHOO! FINANCE (Jan. 28, 2025), https://finance.yahoo.com/news/christian-dior-christian-dior-achieves-194000340.html (last accessed July 28, 2025).
[6] Personal Data, CHRISTIAN DIOR COUTURE, https://www.dior.com/en_us/fashion/personal-data#christian-dior-privacy-policy (last accessed July 28, 2025).

23. According to Defendants' Privacy Statement, "[c]onfidentiality and security of your personal data are important to us. We would like to offer you personalized services while respecting your privacy and choices."[7]

24. Defendants also claim that they "ensure that only duly authorized persons can access your personal data when necessary" for specific purposes delineated in the Privacy Statement.[8]

25. Defendants' Privacy Statement also claims, "[i]n accordance with applicable laws and requirements, Dior and its group companies have put in place measures to fulfill the rights of individuals in relation to the personal data that we (or our third parties) hold about them."[9]

## II. The Breach

26. Defendants experienced a significant data breach on January 26, 2025. An unauthorized actor gained access to customer files through one of Defendants' databases.[10]

27. Defendants claim they did not learn of the Data Breach until May 7, 2025.[11]

28. On or around July 18, 2025, over two months after Defendants learned of the Data Breach, Defendants began to notify Plaintiff and other Class Members that their Private Information was viewed and taken by cybercriminals.

29. Through the Data Breach, the cybercriminal gained unauthorized access to highly sensitive Private Information.

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See* Exhibit A.
[11] *Id.*

30. Plaintiff's Data Breach Notice states that "first and last name, contact information, address, date of birth, and other information you may have provided to Dior, such as passport or government ID number" may have been exfiltrated in the Data Breach.[12]

31. Defendants do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendants have not explained or disclosed these facts to Plaintiff and Class Members.

32. Without these details, Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

33. Defendants' Data Breach notice offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves other than providing credit monitoring, which is woefully inadequate considering the lifelong increased risk of fraud and identity theft that Plaintiff and Class Members now face as a result of the Data Breach.

34. Defendants have offered only a limited two-year subscription for credit monitoring through Experian IdentityWorks.[13] Their limitation is inadequate when the victims will likely face many years of identity theft.

35. Moreover, Defendants' credit monitoring offer and advice to Plaintiff and Class Members squarely place the burden on Plaintiff and Class Members, rather than on Defendants, to monitor and report suspicious activities to law enforcement. In other words, Defendants expect Plaintiff and Class Members to protect themselves from its tortious acts resulting from the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit

[12] *Id.*
[13] *Id.*

monitoring services upon discovery of the Data Breach, Defendants merely sent instructions to Plaintiff and Class Members about actions they could affirmatively take to protect themselves.

## III. The Data Breach was Preventable

36. At all relevant times, Defendants knew, or should have known, that the PII they were entrusted with was a prime target for malicious actors. Defendants knew this given the unique type and the significant volume of data on their networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals for whom the exposure of the unencrypted data would harm.

37. As custodian of Plaintiff's and Class Members' PII, Defendants knew or should have known the importance of protecting their PII, and of the foreseeable consequences and harms to such persons if any data breach occurred.

38. Defendants' security obligations were also especially important due to the substantial increase of cyberattacks and data breaches in recent years, particularly those targeting businesses and other organizations like Defendants, which store and maintain large volumes of PII.

39. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[14] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

40. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's Sensitive Information. Cybercriminals can cross-reference the data stolen from the Data

[14] 2021 Data Breach Annual Report, ITRC, https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last accessed April 3, 2025).

Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

41. On information and belief, Defendants failed to adequately train and supervise their IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing them to lose control over the PII in their possession. Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information.

## IV. Defendants Failed to Comply with FTC Guidelines

42. At all times relevant to this Complaint, Defendants knew or should have known the significance and necessity of safeguarding PII, and the foreseeable consequences of a data breach. Defendants knew or should have known that because they collected and maintained the PII for a significant number of individuals, a significant number of individuals would be harmed by a breach of their systems. Defendants further knew that the data they were entrusted with was highly valuable and contained private and sensitive information.

43. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

44. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[15] The guidelines highlight that businesses should (a) protect the

---

[15] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed June 30, 2025).

personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

45. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

46. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

47. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

48. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

49. Defendants knew or should have known of its obligation to implement appropriate measures to protect its customers' PII but failed to comply with the FTC's basic guidelines.

50. Defendants' failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

51. Once Defendants became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including taking *any* steps whatsoever to attempt to mitigate the harm caused by the breach.

52. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII.

53. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[16] Plaintiff and Class Members generally have spent considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice

[16] *Identity Theft: Protect Yourself, Secure Your Future*, MARYLAND OFFICE OF THE ATTORNEY GENERAL, https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf (last accessed July 2, 2025).

Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[17]

## V. Defendants Failed to Comply with Industry Standards

54. Security standards for businesses storing PII commonly include, but are not limited to:

a) Maintaining a secure firewall;

b) Monitoring for suspicious or unusual traffic on the website;

c) Looking for trends in user activity including for unknown or suspicious users;

d) Looking at server requests for PII;

e) Looking for server requests from VPNs and Tor exit nodes;

f) Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII;

g) Structuring a system including design and control to limit user access as necessary, including a user's access to the account data and PII of other users.

55. Other best practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

56. Defendant failed to meet minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR- DS-02, PR.DS-10,

[17] Erika Harrell, *Victims of Identity Theft, 2014*, U.S. DEP'T OF JUSTICE, https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last accessed July 2, 2025).

PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM- 06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIC CSC), which are all established standards in reasonable cybersecurity readiness.

57. These frameworks are existing and applicable industry standards which Defendants failed to comply with.

## VI. Plaintiff's and Class Members' Experiences

58. Holland purchased a Dior wallet for his daughter in August 2024.

59. Plaintiff provided his sensitive PII to Defendants as a condition of purchasing the wallet from Defendants.

60. Plaintiff received notice of the Data Breach on or around July 24, 2025, informing him that his sensitive information was part of Defendants' Data Breach.

61. Sometime after purchasing the wallet from Defendants, an unauthorized purchase of a laptop using Holland's credit card was attempted. Upon information and belief, the charge was for $2,000. Holland's bank blocked the unauthorized purchase.

62. Plaintiff has frozen his credit and bank accounts since August, unfreezing them only when he needs to make expenditures.

63. As an employee of a bank, Plaintiff monitors his accounts very closely.

64. An unauthorized actor also filed a fraudulent 2024 tax return in Holland's adult daughter's name and obtained the refund that was intended for Plaintiff's daughter.

65. A similar attempt was made to file a fraudulent tax return in Holland's name, but he had additional protections enabled to prevent this from occurring.

66. Plaintiff claims his adult daughter as a dependent on his tax returns.

67. Plaintiff and his wife have had to file an extension on their own tax return until the issue with their daughter's fraudulent tax filing is resolved.

68. Plaintiff has had to correct his daughter's tax return twice as a result of the fraudulent tax filing.

69. Holland and his wife have been stressed trying to remedy their daughter's fraudulent tax return. They are concerned that they may have to deal with more unauthorized financial transactions that will prevent them from completing their planned home renovation.

70. Plaintiff provided Defendants with his most sensitive personal information and cannot be sure how much of it was exfiltrated.

71. Holland suffered an actual injury in the form of damages and diminution in the value of his Private Information—a form of tangible property that Plaintiff Holland entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

72. Plaintiff has suffered imminent and impending injury arising from the heightened risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

73. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

## VII. Defendants Breached Their Obligations to Plaintiff and the Class

74. Defendants fail to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and they entirely fail to provide any

compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' PII, out-of-pocket costs, and the time taken by Plaintiff and Class Members to mitigate their injuries.

75. Plaintiff and Class Members have been damaged by the compromise and exfiltration by cybercriminals of their PII as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of the Data Breach.

76. Plaintiff and Class Members were damaged since their PII is being sold or potentially for sale by cybercriminals in the years to come.

77. As a direct and proximate consequence of Defendants' conduct, Plaintiff and Class Members have been placed at an imminent, actual, and substantial risk of harm from fraud and identity theft, especially considering the actual fraudulent misuse of the PII that has already taken place.

78. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

79. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

80. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

81. Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cybercriminals in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

82. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity.[18] The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[19]

83. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

84. Many Class Members suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a) Finding fraudulent charges;

b) Cancelling and reissuing credit and debit cards;

c) Purchasing credit monitoring and identity theft prevention;

---

[18]Medical Identity Theft: FAQs for Health Care Providers and Health Plans, FTC, *available at* https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed Jan. 8, 2024).

[19]Justin Klawans, *What is medical identity theft and how can you avoid it?*, THE WEEK (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid (last accessed July 23, 2025).

d) Monitoring their medical records for fraudulent charges and data;

e) Addressing their inability to withdraw funds linked to compromised accounts;

f) Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g) Placing "freezes" and "alerts" with credit reporting agencies;

h) Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i) Contacting financial institutions and closing or modifying financial accounts;

j) Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k) Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l) Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

85. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal information is not accessible online and that access to such data is password protected.

86. Defendants' delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII. Early notification helps a Data Breach victim mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendants knew of the breach since January 2025, and did not notify all victims until July 2025.

## CLASS ACTION ALLEGATIONS

87. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and those similarly situated, on behalf of the following class (the "Class" or "Class Members"):

> All individuals within the United States whose PII were exposed to unauthorized third parties as a result of the Defendants' Data Breach discovered by Defendants in May 2025.

88. Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

89. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

90. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Upon information and belief, the class is comprised of at least thousands of individuals.

91. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendants failed to take adequate and reasonable measures to ensure their website and data systems were protected;

b) Whether Defendants failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c) Whether Defendants unreasonably delayed in notifying customers of the harm they suffered once the suspicious activity was detected;

d) Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII;

e) Whether Defendants breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII;

f) Whether Defendants took sufficient steps to secure Class Members' PII;

g) Whether Defendants were unjustly enriched;

h) Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

i) Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

92. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

93. **Adequacy of Representation.** Plaintiff is an adequate class representative because he is a Class Member, and his interests do not conflict with the Class's interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the Class's benefit and will fairly and adequately protect their interests.

94. **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court

system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

95. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. D efendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## <u>CLAIMS FOR RELIEF</u>

### Count 1
### Negligence
### On behalf of Plaintiff and the Class

96. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

97. Plaintiff and Class Members entrusted their PII to Defendants with the understanding that they would safeguard their PII.

98. Defendants had full knowledge of the sensitivity of the PII that they stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed.

99. Defendants violated their duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendants' information security controls sufficiently rigorously to ensure that PII in their possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify victims of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

100. Defendant's duty of care arose from, among other things,

a) The special relationship between Defendants and their customers resulting from Plaintiff and Class Members entrusting Defendants with confidential PII;

b) Defendants' exclusive ability (and Class Members' inability) to ensure that their systems, website, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

d) Defendants' common law duties to adopt reasonable data security measures to protect customer PII and to act under the same or similar circumstances as a reasonable and prudent person would act.

101. Plaintiff and Class Members were the foreseeable victims of Defendants' inadequate data security. Further, the breach of security was reasonably foreseeable given the

known high frequency of cyberattacks and data breaches. Defendants knew that a breach of their systems could and would cause harm to Plaintiff and Class Members.

102. Defendants' conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately mitigate harm through negligently failing to inform victims of the breach of the specific information breached for (as of time of writing) over two months after the purported first discovery of the breach.

103. Defendants knew or should have known of the inherent risks in collecting and storing massive amounts of PII and the importance of limiting disclosure of that PII.

104. Defendants, through their actions and inactions, breached their duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in their possession and control. Defendants breached their duty by, among other things, their failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, failure to monitor the security of their networks and systems, and allowing unauthorized access to Plaintiff's and Class Members' PII.

105. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact.

106. Defendants inadequately safeguarded PII in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

107. But for Defendants' breach of their duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen.

108. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiff and Class Members.

109. As a result of Defendants' failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

110. As a direct and traceable result of Defendants' negligence, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

111. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

112. Plaintiff also seek such other relief as the Court may deem just and proper.

**Count 2**
**Negligence *Per Se***
**On behalf of Plaintiff and the Class**

113. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

114. Section 5 of the FTC Act, 15 U.S.C. § 45 prohibits, "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.

115. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and by failing to comply with industry standards.

116. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendants' systems. Plaintiff was required to provide PII as a precondition for purchasing goods from Defendants. Plaintiff and Class Members entrusted their PII to Defendants with the understanding that they would safeguard their PII.

117. Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

118. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

119. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

120. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they failed to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

121. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**Count 3**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Class**

122. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

123. Plaintiff and Class Members were required to entrust their PII to Defendants as part of the process of purchasing luxury goods from Defendants.

124. Defendants solicited, offered, and invited Plaintiff to provide their PII in order to purchase goods from Defendants. Plaintiff and Class Members accepted Defendants' offers and provided their PII to Defendants.

125. Defendants accepted possession of Plaintiff's and Class Members' PII for the purpose of providing goods to Plaintiff and Class Members.

126. Plaintiff and Class Members entrusted their PII to Defendants. In so doing, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect PII, and to timely and accurately notify Plaintiff and the Class if their data has been breached and compromised or stolen.

127. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

128. Implicit in the agreement between Plaintiff and Class Members and Defendants to provide PII, was Defendants' obligation to: (1) use such PII for business purposes only, (2) take

reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII, (3) prevent unauthorized disclosures of the PII, and (4) retain PII only under conditions that kept such information secure and confidential.

129. As part of these transactions, Defendants agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised.

130. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendants' data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendants' own representations.

131. Implicit in the agreement between Defendants, Plaintiff, and Class Members was the obligation that both parties would maintain information confidentially and securely.

132. These exchanges constituted an agreement and meeting of the minds between the parties.

133. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have provided and entrusted their PII to Defendants in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

134. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

135. Defendants breached their implied contracts with Plaintiff and Class Members to protect their PII when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with

the legal obligations necessarily incorporated into these agreements; and; (4) failed to notify Plaintiff and Class Members of the specific data breached in a reasonably timely manner.

136. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

137. As a direct and proximate result of the breach/unauthorized disclosure, Plaintiff and Class Members are entitled to relief as set forth herein.

138. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 4**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

139. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

140. This count is brought in the alternative to Plaintiff's breach of contract claim.

141. Plaintiff and Class Members conferred a benefit on Defendants when they provided their PII to Defendants to obtain luxury goods.

142. Upon information and belief, the monies paid to Defendants in the ordinary course of business included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' PII.

143. Defendants, however, failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

144. Defendants would not be able to carry out an essential function of their regular business without the money obtained in the ordinary course of business and PII provided by their consumers. Plaintiff and Class Members expected that Defendants or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

145. Defendants acquired the PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

146. Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiff and Class Members for business purposes, while failing to use the payments they

received for adequate data security measures that would have secured Plaintiff's and Class Members' PII and prevented the Data Breach.

147. If Plaintiff and Class Members knew that Defendants had not reasonably secured their PII, they would not have provided their PII to Defendants.

148. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to their own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their PII.

149. Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits that Plaintiff and Class Members conferred upon them.

150. Plaintiff and Class Members have no adequate remedy at law.

151. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injuries that include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing

bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

152. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members were underpaid by Defendants.

153. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 5**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiff and the Class**

154. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

155. Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' PII.

156. Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

157. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their private information will occur in the future.

158. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a) Defendants owe a legal duty to adequately secure the PII of Plaintiff and the Class within their care, custody, and control under the common law and Section 5 of FTC Act;

b) Defendants breached their duty to Plaintiff and the Class by allowing the Data Breach to occur;

c) Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiff and the Class within Defendants' custody, care, and control; and

d) Defendants' ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

159. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiff and the Class within their custody, care, and control, including the following:

a) Order Defendants to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiff and Class Members; and

b) Order that, to comply with Defendants' obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems, networks, and servers on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. Encrypting and anonymizing the existing PII within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendants to provide services to their employees or customers;

iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. Auditing, testing, and training its security personnel regarding any new or modified procedures;

v. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendants' internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

160. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

161. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable

prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

162. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate; and

H. All such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: July 28, 2025

Respectfully submitted,

**MILLER SHAH LLP**

/s/ Laurie Rubinow
Laurie Rubinow (Bar # 5170014)
James C. Shah (Bar # 5137518)
225 Broadway, Ste. 1830
New York, NY 10007
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Amber L. Schubert*
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Ste. 200
San Francisco, CA 94123
Telephone: 415-788-4220
Facsimile: 415-788-0161
aschubert@sjk.law

*Counsel for Plaintiff and the Proposed Class*

*pro hac vice forthcoming